Filed 8/6/21  In re A.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | C091797 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.R.,<br><br>Defendant and Appellant. | (Super. Ct. No. 19DP00063) |

J.R., father of the minor, appeals from several of the juvenile court's March 10, 2020 findings and orders entered at the six-month review hearing, including orders limiting father's educational rights and setting visitation, as well as findings of detriment and the non-application of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et

seq.).  (Welf. & Inst. Code, §§ 361, 366.21, subd. (e), 395[1].)  Father also purports to appeal from the juvenile court's earlier orders denying his motions to vacate the court's previously entered dispositional orders.

As we explain, the appeal from the order denying the motion to vacate comes too late, as does any attempt to appeal from the dispositional findings and orders.  Any such claims must be disregarded for lack of jurisdiction.  The remaining claims fail to persuade; we affirm those orders of the juvenile court over which we have jurisdiction.

## BACKGROUND

The minor, aged 15 at the time, came to the attention of the Butte County Department of Health and Human Services (Department) in March 2019 after she was found outside naked in 30-degree weather.  She had been diagnosed with an intellectual disability and was nonverbal and developmentally delayed; she needed to be supervised at all times.  The Department filed a dependency petition on her behalf pursuant to section 300, subdivisions (b) and (g).  The petition alleged failure to protect, and set forth that the Department had previously received multiple referrals regarding the safety and well-being of the minor, father's emotional well-being, father's ability to adequately meet the minor's needs, father's ability to properly supervise the minor, and the concerning condition of their home.  The petition further alleged failure to provide care or support due to the fact that father was in jail at the current time and mother's whereabouts were unknown.

On April 11, 2019, the court sustained the petition as modified and ordered visitation with the time, place, and manner to be arranged by the Department.  The disposition hearing was ultimately held on August 15, 2019.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

On June 7, 2019, the Department filed a petition pursuant to section 388 seeking to limit father's right to make education decisions for the minor. The minor was 16 years old and had yet to be enrolled in any formal education institution (school). The Department believed it would be in the minor's best interest to be in school, and noted father's "ideology and beliefs have significantly impeded his ability to meet the child's education needs," father "does not want the child enrolled in school because [schools] are dangerous, and that [schools] will indoctrinate her into the culture of society," the Department "has attempted to refer the father into services, such as case management services, and the father has not attended," and the mother had not been involved in or participated in the child's life for the past 13 years. The petition stated the requested order would benefit the minor "by furthering her intellectual progress she has made while in foster care, as well as benefiting from additional socialization." At a hearing on the petition, with father (and mother) in court, the juvenile court denied the petition "for now" but asked the parties to work out the issue informally. Father reportedly refused to attend the intake for case management services, claiming he "doesn't need any services." He hung up on the social worker when she tried to contact him.

The July 2019 disposition report stated that, due to father's lack of engagement, the Department was unable to meet with him to develop a plan to identify his needs. He regularly sent e-mails and other written communications to the social worker claiming detention of the minor was illegal and making other allegations; he also declined to participate in any counseling or classes. Although his twice-weekly visits with the minor were going well and she was happy to see him, over the last two months he had cancelled several visits a month due to his not feeling well, his need to assist mother, or doctor's appointments.

The social worker had been calling father several times a week, but he refused to speak with her or yelled profanities at her or simply hung up. She faxed and mailed letters to father requesting that he contact her, but his return communications were

3

"copious amounts of faxes of [an] inappropriate nature, such as newspaper clippings, and pictures with various statements such as, 'suck this cunt,' 'burn in hell cunt,' 'leave us the fucking goddamn hell alone.' " Although father did call and schedule a home visit in June 2019, he refused to answer the door when the social workers arrived. He had not enrolled the minor in school.

After a continuance in the disposition date, the Department filed an addendum report stating the social worker had been unable to see father's home despite several attempts, and father had experienced significant medical issues. He had informed the social worker that he had "medical and physical incapacities" and that mother, who was now living in the home permanently, was having seizures due to her epilepsy. After an episode where father passed out before the minor arrived for her visit and remained unconscious for the full hour of the visit, father had cancelled more visits due to his medical incapacities. The Department reported its continuing concerns about father's ability to safely and adequately care for the minor due to his medical issues. Additionally, mother was now at the home and needed to be appropriately assessed; she was experiencing significant medical issues of her own, leaving her unable to provide the 24-hour supervision needed by the minor.

*Notice and the Disposition Hearing*

On August 5, 2019, the Department sent father, via first class mail, a "Notice of Review Hearing – Juvenile" with the "other – disposition" box checked. The notice stated the hearing was scheduled to be held on August 15, 2019 at 8:30 a.m. in department "TBA" at the courthouse, and that the social worker recommended "No change in orders, services, placement custody, or status."

Neither parent appeared at the August 15, 2019 disposition hearing. Father's counsel stated that father had "left me numerous messages, always in the middle of the night, telling me not to contact him, calling me a bitch and that I'm a fascist . . . . And I really have no position on his behalf because he's given me nothing other than he objects

4

to everything." Counsel added: "I'm not submitting. I just will object with no evidence or testimony." Without objection from counsel, the juvenile court found notice was given as required by law. Finding there was a substantial danger to the health, safety, protection, and emotional well-being of the minor with no reasonable means by which to protect her absent removal, the court adjudged the minor a dependent of the juvenile court and found out-of-home placement was necessary and appropriate. The court noted the minor's educational needs were being met and there was no need at the time to limit father's educational rights. The court ordered that reunification services be provided to the parents, and further ordered that visitation "shall be allowed consistent with the well-being of the child" with the frequency to be in accordance with the case plan agreement and the time, place, and manner of visitation to be arranged by the Department. After the hearing, the court relieved father's counsel and appointed Dale Rasmussen to represent father.

Neither parent appeared at a September 5, 2019 hearing related to counsel for mother. The juvenile court discussed the "various reports that have come [] to me about the horrible conduct of both mother and father in this case. . . . This came to my attention because [father] had threatened to burn the courthouse down, and had been sending nasty, horrible e-mails and telephone messages to the attorneys." At Rasmussen's request, the Department confirmed it had provided notice of the September hearing to father and received correspondence from father stating he would not be attending the hearing. Rasmussen indicated that he "would like the opportunity to perhaps move to reopen the disposition hearing" after he spoke with father about it. The court responded that in "an abundance of caution, I'll let you reopen, if you need to." The Department informed the juvenile court that it was continuing to receive "very inappropriate messages" from father. The court directed Rasmussen to contact father and tell him to stop contacting the Department and all counsel except his own, and only then "regarding legal issues."

5

The next hearing was held on September 12, 2019; neither parent was present. The juvenile court relieved mother's counsel and appointed Rasmussen to represent both father and mother. At Rasmussen's request, the court set an interim review hearing for October 31, 2019.

Neither parent attended the October hearing. The social worker reported that the parents were not participating in services and had not signed the case plan, but father continued to send correspondence to the Department on a daily basis. At Rasmussen's request, the court set the matter for another interim review hearing on December 5, 2019. Again, neither parent attended that hearing. The social worker reported the minor was doing extremely well in placement, but that the social worker still could not meet with father. Rasmussen reported that both parents had "some pretty major health problems" and that father promised to stop sending faxes to anyone other than counsel.

*Motion to Vacate the Disposition Orders*

On January 15, 2020, father (through Rasmussen) filed a motion to vacate the disposition orders entered five months prior. The motion argued the parents were not present at the disposition hearing, "it is not readily apparent that the parents were aware of the implications and effect of submitting at disposition," and "inflammatory statements attributed to Father had potentially been disseminated to various involved individuals prior to disposition." Rasmussen filed a declaration wherein he indicated that father had trouble understanding the process and Rasmussen was "doubtful that he had any such understanding at the time of disposition on August 15, 2019." Rasmussen added that father was unwilling to participate in "conventional services such as parenting, counseling, and drug testing as directed by [the Department]."

A hearing on father's motion to vacate was ultimately held on January 30, 2020, which was also the original date for the six-month review hearing.

On January 28, 2020, the Department filed a status review report. As relevant here, the social worker reported that the parents had not made themselves available and had only minimal contact with the Department. Father continued to send multiple daily inappropriate and profane faxes to the Department. The minor was doing well in her foster placement; however, she was still not enrolled in school. The foster parent strongly believed that the minor could benefit from an educational program. The Department requested that the parents' education rights be limited and that education rights be granted to the foster parent.

The Department concluded it was not safe to return the minor to the parents' custody given the parents' minimal contact with the Department and their failure to participate in court-ordered reunification services. The parents had not demonstrated an ability to meet the minor's needs and the Department continued to have significant concerns regarding the parents' ability to provide 24-hour care for and supervision of the minor.

The parents did not appear at the January 30, 2020 hearing. The juvenile court denied the motion to vacate the disposition orders without prejudice noting, "These folks have never come to court. I believe they came to court one or two times, and it's just been a series of problems with getting them to cooperate. They are not doing services, and they are creating lots of problems for my attorneys and [the Department] staff." Father's counsel confirmed the parents had notice of the hearing; nonetheless, the court continued the six-month review hearing to February 13, 2020. The parents were not present at the February 13 hearing, but Rasmussen made an oral motion to renew his previously denied motion to vacate the disposition orders, which the juvenile court denied.

*Six-Month Review Hearing*

Ultimately, the continued six-month review hearing was held on March 10, 2020; neither parent was present. Rasmussen confirmed father had notice of the hearing and added, "I believe he's not here because he doesn't want to be." The court received into evidence the January 28, 2020 report, found proper notice of the hearing was given to the parties, and confirmed the recommendation was for the minor's continued out-of-home placement with reunification services to both parents. Father's counsel objected, but presented no evidence or testimony. The court also found father made no progress in services.

Addressing the Department's request to limit the parents' educational rights, the social worker indicated that the parents had not contacted the foster parent "to work on an educational plan for the child. She's at home right now and just learning from the staff members there. But we are requesting that the current foster parents be designated as the [educational rights] holder for the child." The court confirmed that this designation would "enable the foster family and the [Department] to meet the child's educational needs." Father's counsel objected, but the court found: "There is a need to limit the educational rights at this time. The child's educational needs are not being met."

The juvenile court also found return of the minor to the parents' care and custody would create a risk of detriment, continued out-of-home placement, authorized a psychiatric evaluation for father, ordered continued visitation, and designated the foster parent as the minor's educational rights holder.

On April 6, 2020, father filed a notice of appeal, purportedly from the March 10 hearing, but also checked a box on the form indicating that he was appealing from a "motion to set aside dispositional orders" that was heard "[o]n or about February 25, 2020."

8

## DISCUSSION

### I

*Appeal from Denial of Motion to Vacate Disposition Orders*

Father first purports to appeal the (January 30, 2020) denial of his motion to vacate the disposition orders. His notice of appeal was filed on April 6, 2020, more than 60 days after the entry of the order he claims to challenge. The timely filing of a notice of appeal is a jurisdictional requirement. (*Mauro B. v. Superior Court* (1991) 230 Cal.App.3d 949, 953.) Father does not explain, and we do not see, how we have jurisdiction to consider his appeal of this order. On February 13, 2020, the court denied a *motion to renew* the motion to vacate, but that is not the order from which father purports to appeal. Further, father's only real challenge to any aspect of the ruling on his motion to vacate is to the finding that he received proper notice of the dispositional hearing; that finding was entered on August 15, 2019, and has long been final.

" 'In the absence of statutory authorization, neither the trial nor appellate courts may extend or shorten the time for appeal [citation], even to relieve against mistake, inadvertence, accident, or misfortune [citations]. Nor can jurisdiction be conferred upon the appellate court by the consent or stipulation of the parties, estoppel, or waiver. [Citations.] If it appears that the appeal was not taken within the 60-day period, the court has no discretion but must dismiss the appeal of its own motion even if no objection is made.' " (*Hollister Convalescent Hosp., Inc. v. Rico* (1975) 15 Cal.3d 660, 666-667.)

Father argues (correctly) that he may seek modification of a disposition order by way of a section 388 petition despite a failure to appeal from that order, but that has nothing to do with the procedural posture of the contested orders and notice of appeal currently before us in *this* case. Here, father did not file a section 388 petition from the disposition, nor did he appeal from the August 2019 disposition order. Instead, he filed a motion to vacate, which was heard and denied on January 30, 2020, more than 60 days

9

before father filed his notice of appeal. We lack jurisdiction to consider this claim and any claims based on the dispositional orders entered in August 2019.

## II

### *Six-Month Review Hearing*

Father's claims related to the March 10, 2020 review hearing are timely brought; we next consider these claims.

A. *Educational Rights*

Father contends the court abused its discretion in limiting his right to make educational decisions for the minor and that the Department failed to articulate a sufficient basis for the need to limit father's rights. We disagree.

As we have set forth *ante*, the Department had concerns about the minor's educational development as early as June 7, 2019, when it petitioned to limit father's right to make educational decisions. At that time, the minor was 16 years old and had yet to be enrolled in any formal educational institution due to the fact that father felt schools were dangerous. The Department believed it would be in the minor's best interest to be enrolled in school, noting enrollment would comply with federal mandates while the minor was placed in the temporary care and custody of the juvenile court, and felt the requested order would benefit the minor by furthering the intellectual progress she had already made while in the care of her foster parent and by affording her additional socialization. The juvenile court denied the motion, instructing the parties to work it out informally. But father's only interest in communication with the Department and others involved in the case was in the form of written and verbal profanity-laced tirades.

By the time of the January 28, 2020 status review report, the minor had yet to ever attend school because the parents continued to refuse to enroll her in any educational program. As a result, the Department again requested that the parents' education rights be limited and that education rights be granted to the foster parent. At the March 10, 2020 hearing (at which the parents failed to appear), the court agreed that there was a

10

need to limit the parents' educational rights, noting the minor's educational needs were not being met. The social worker reported that the parents had not worked with the foster parent on an education plan for the minor. It was at this point that the court entered the disputed order limiting father's educational rights.

Parents have a constitutionally protected right to control their children's education. (*Troxel v. Granville* (2000) 530 U.S. 57, 65; *In re R.W.* (2009) 172 Cal.App.4th 1268, 1276.) However, when a child has been declared a dependent under section 300, the court may limit that control to the extent necessary to protect the child. (§ 361, subd. (a)(1); see Cal. Rules of Court, rule 5.650(a).) We review orders limiting parents' educational rights under an abuse of discretion standard, bearing in mind that " '[t]he focus of dependency proceedings is on the child, not the parent.' " (*In re R.W., supra*, 172 Cal.App.4th at p. 1277.)

Here, the 16-year-old minor was nonverbal and developmentally delayed. However, she responded well to social interaction and made significant developmental progress in foster care, and the foster parent felt strongly that the minor could benefit from an educational program and further socialization. Despite the Department's efforts to communicate with father and engage him in the process, there was no indication at any point in the proceedings that father was willing to enroll the minor in any type of educational program or ensure the minor's educational development once she was enrolled. Under these circumstances, the juvenile court did not abuse its discretion in concluding that an order limiting father's educational rights was necessary.

B. *Visitation*

Father contends the court's visitation order constituted an improper delegation of judicial powers and was therefore an abuse of discretion. He acknowledges that he did not specifically object to the order at the time of its entry, but asks that we excuse any forfeiture and decide the issue on the merits. We decline to do so.

11

A party forfeits a claim that the juvenile court improperly delegated its visitation authority to a third party when they fail to object in the juvenile court. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 685-686.) Father's counsel was present at the hearing when the juvenile court ordered visitation between father and the minor consistent with the minor's well-being, leaving the time, place, and manner of visitation to be arranged by the Department. Counsel did not object to, or request modification of, the visitation order in the juvenile court. Had a timely objection been lodged, the juvenile court would have had an opportunity to address the objection and modify the order if necessary. By failing to object, father tacitly consented to the order as phrased and has forfeited any challenge on appeal.

C. *Detriment*

Father next contends the juvenile court erred when it failed to specify the factual basis for its finding that return of the minor to his custody would be detrimental. We see no error.

"At the review hearing held six months after the initial dispositional hearing . . . , the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds . . . that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).) "In making its determination, the court shall review and consider the social worker's report and recommendations . . . and shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided . . . ." (*Ibid.*)

"Regardless of whether the child is returned to a parent or legal guardian, the court shall specify the factual basis for its conclusion that the return would be detrimental or would not be detrimental." (§ 366.21, subd. (e)(2).)

12

After considering the status review report and expressly finding the parents had made no progress, the juvenile court found return of the minor to the parents' care and custody would create a risk of detriment. The written order after the hearing stated in relevant part as follows: "By a preponderance of the evidence, the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The factual basis for this conclusion is as stated on the record and/or as set forth in the report of the social worker."

Father argues the juvenile court did not satisfy the requirement to state the factual basis upon which the finding of detriment was premised because the court merely made "canned findings." But the findings were clearly sufficient to satisfy the statutory requirement. The court explicitly found no progress by the parents, and incorporated the Department's report by reference that amply explained why return would be detrimental to the minor. The social worker reported the parents failed to participate in court-ordered reunification services; failed to work with the Department; and demonstrated no ability to meet the minor's needs. "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.21, subd. (e)(2); see *M.G. v. Superior Court* (2020) 46 Cal.App.5th 646, 660 [" 'In deciding whether it would be detrimental to return a child, the easy cases are ones where there is a clear failure by the parent to comply with material aspects of the service plan' "].)

There was sufficient evidence to support the juvenile court's finding that return of the minor to the parents' care and custody would create a risk of detriment and the court made adequate findings in that regard.

D. *ICWA*

Finally, father contends the court's ICWA findings must be reversed because the Department failed to comply with the ICWA. We ordered the record augmented and also ordered supplemental briefing from the parties regarding mootness given subsequent

13

events, which we detail *post*. In his supplemental briefing, father clarifies that his specific and remaining claim of prejudicial error, which he argues continues and is not without a remedy we can provide, is that the Department "erred in failing to interview mother's adult son, Sativa [S.] . . . as well as mother's adult brother, Alex W." He adds that: "Most importantly, the Department failed to interview the person most knowledgeable about mother's Native American ancestry: Bruce L., who lived in Chico."

Father further clarifies that the remedy he seeks is reversal of the six-month review orders and remand "with direction the juvenile court order the Department to inquire of mother's relatives, including Bruce L., Sativa [], and Alex W., and thereafter provide further notice to the respective Tribes with whatever additional information is received." We now consider and reject these claims, and decline to remand.

### 1. *Background*

We include only the facts relevant to father's remaining ICWA claims on appeal.

Mother was absent from the detention hearing. Father testified he had no known Indian ancestry, but he believed mother had some Cherokee ancestry. Father testified that a maternal great uncle, later identified as Bruce L., "used to" live in Chico and would be the best person to contact about the Cherokee side.

On March 31, 2019, the ICWA monitor interviewed mother, who stated she had Choctaw and Yurok Indian ancestry but was unable to provide specific information regarding the minor or the minor's eligibility for enrollment in any tribe. Mother provided the name and birthdate of Bruce L., but had no contact information for him. The monitor attempted to contact the ICWA representative of the Yurok Tribe by telephone but received no response.

On April 2, 2019, the ICWA monitor filed an Indian ancestry questionnaire containing information obtained from the parents related to the minor's relatives. As relevant here, the questionnaire included mother's belief that the minor had possible

Indian heritage with the Yurok and Choctaw Tribes; information about Bruce L., including his full name, birth date, and possible affiliation with the Yurok and Choctaw Tribes; information about the maternal great-grandmother, including her possible affiliation with the Yurok Tribe; and information about the maternal great-grandfather, including his possible affiliation with the Hoopa Tribe. Mother indicated she did not know if any of her extended family ever lived on a federal trust land, reservation, rancheria, or Indian allotment.

On April 2, 2019, the Department sent the ICWA-030 form (ICWA notice) to multiple tribes and also the Bureau of Indian Affairs (BIA). The notice included the information obtained from the parents and, in relevant part, set forth above. At the April 11, 2019 jurisdiction hearing, the court found the minor "may be an Indian child" and that the ICWA may apply. On April 24, 2019, the Department filed ICWA return receipts from the BIA and a number of the noticed tribes, including multiple Choctaw Tribes and the Yurok Tribe.

At a hearing on May 2, 2019, mother testified she had Indian ancestry with the Yurok, Pit River, Hoopa, and Choctaw Tribes through her mother's side of the family. As relevant here, Mother provided the names of her brother, Alex W., whose whereabouts were unknown to her, and her adult son, Sativa, who she said was in Eureka; she did not indicate that either might have any particular information regarding any Native American ancestry. Mother also completed a form stating she may have Indian ancestry with the Yurok, Pit River, Hoopa, and Choctaw Tribes. The juvenile court again found that the ICWA may apply.

On June 5, 2019, the Department sent an amended ICWA notice to the BIA and 15 tribes including the Hoopa Tribe, the Pit River Reservation, the Yurok Tribe, and multiple Choctaw tribes. The amended notice contained the new information provided by mother on the form, namely that she may have Indian ancestry with the Pit River and

15

Hoopa Tribes, and noted that the Department's multiple attempts to contact mother since the May 2, 2019 hearing had been unsuccessful.

On June 13, 2019, mother provided the Department with a copy of her birth certificate which listed Hoopa, California as her place of birth. On June 17, 2019, the Department sent a second amended ICWA notice containing corrected information about mother's place of birth to the 15 previously identified tribes and the BIA.

On July 16, 2019, the Department filed return receipts for the ICWA notices sent to the 15 tribes and the BIA. In October 2019, the Department filed response letters from all 15 of the noticed tribes, all of which concluded the minor was neither a member nor eligible for membership in the tribe or that the minor was neither enrolled nor eligible for enrollment in the tribe.

On October 31, 2019, after both parents' counsel submitted, the court granted the Department's motion to rule out application of the ICWA, finding the responses from the respective tribes and the BIA "do not establish that the minor is an Indian child or are not determinative of whether the minor is an Indian child" within the meaning of the ICWA. The Department's subsequent reports stated the ICWA "does not apply."

The six-month review hearing (from which father appeals) commenced on March 10, 2020; the juvenile court made no new ICWA findings at that hearing.

On May 20, 2020, mother moved the juvenile court to reopen inquiry on application of the ICWA; the bases for the motion are not relevant here as they are not repeated on appeal. On May 26, 2020, father filed a section 388 petition seeking modification of the court's October 2019 ruling finding ICWA inapplicable. The petition argued the Department "failed to affirmatively fulfill its continuing duty to inquire about the child's Indian status" and it was in the minor's best interest to vacate the prior order in order to reach a final determination on the issue of the minor's Indian status. In particular, the petition argued the Department "should have taken more affirmative steps

16

to collaborate with" the Hoopa and Yurok Tribes. Father also filed a petition seeking appointment of an ICWA expert.

On June 11, 2020, the Department filed a declaration regarding its ICWA efforts stating the ICWA monitor successfully contacted the Yurok Tribe on June 5, 2020, and received an e-mail response from the Yurok Tribe on June 9, 2020 that said: "We have reason to believe that the child is an Indian Child; however, the Yurok Tribe will not be intervening or a party in this case at this time." A subsequent response stated: "[b]ased on the information you provided the Tribe's ICWA manager, the child is not eligible or enrolled in the Yurok tribe but the Yurok Tribe believes there is reason to believe ICWA may apply based on that same information."

On June 16, 2020, the parties argued father's section 388 petition, mother's motion to reopen ICWA, and the parents' respective requests to transfer the case to a tribal jurisdiction and the juvenile court continued the matter to be heard at the upcoming contested hearing. At the 12-month review hearing on August 18, 2020, the juvenile court denied the petitions to transfer the case to the Yurok tribe and also denied the request to change or vacate the previous ICWA order currently before us on appeal.

2. *Analysis*

As we have set forth above, father now argues specifically that the Department failed to discharge its duty to conduct further inquiry including locating and interviewing three people: Bruce L., Sativa, and Alex W. The Department does not appear to dispute that it did not find and interview these people. Thus, the question before us is whether the ICWA required that these three people be located and interviewed by the Department, based on the information provided to it. We see no such requirement and no prejudicial error from the Department's failure to interview these three and include any additional information they *may* have provided in the ICWA notices sent to the various tribes. Any error (as well the nature of any information these three might have provided) is purely speculative in this case.

"[E]rrors in an ICWA notice are subject to review under a harmless error analysis." (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1415.)  Error is not presumed.  It is father's obligation to present a record that affirmatively demonstrates error.  (*In re D.W.* (2011) 193 Cal.App.4th 413, 417-418.)  He has not done so here.

As for Bruce L., the Department's only information about him came from father, who offered only that there was a great uncle who at some point was in Chico and might know more about mother's (at that point allegedly Cherokee, which we now know was incorrect as Cherokee was not one of the tribes later identified by mother) heritage. Mother later provided Bruce L.'s full name, birth date, birthplace, and possible affiliated Indian tribes, but no more.  Mother also told the court that she had a brother, Alex W., but did not know where he was, and an adult son, Sativa, who lived in Eureka. Meanwhile, the ICWA monitor conducted relative locator searches as to mother in an attempt to identify and locate any maternal relatives.  Those searches yielded no information.

Mother provided no additional information other than her birth certificate indicating she was born in Hoopa, California.  Indeed, the first amended ICWA notice, mailed on June 5, 2019, noted that the Department's multiple attempts to contact mother to determine if she had any new information regarding her Indian ancestry had been unsuccessful.  The maternal grandparents were deceased, neither parent knew how or where to contact Bruce L., and the Department was unable to locate him or any other maternal relative through its various searches.

As previously discussed, the Department obtained detailed information about mother and the maternal grandparents and great-grandparents and provided that detailed information in the form of ICWA notices to the BIA and 15 tribes.  From that information, the tribes were able to confirm the minor was not an Indian child for purposes of the ICWA.  Although father posits that "it is reasonably probable" information provided by Bruce L. would have changed the Yurok Tribe's determination

18

that the minor was not eligible or enrolled in the Tribe, this is pure speculation, based only on father's detention hearing information that a then-unnamed great uncle knew about mother's heritage. The same speculation underlies father's claim that had the Department "properly interviewed Bruce L. and the other relatives, it is reasonably probable it could have obtained more information" to provide to the other tribes.

Father does not point to *any* suggestion in the record that the brother (Alex W.) and son (Sativa) had any useful information, and we again decline to speculate. Any failure of the Department to locate these three relatives and interview them was harmless error in light of the completely speculative nature of any contribution they might have offered, the fact that there was already sufficient information provided to enable the BIA and the tribes to make a determination regarding the minor's status as an Indian child, and the fact that nothing in the record indicates even a remote likelihood that the three interviews father seeks would have altered that reality.

As we have described in detail *ante*, the Department made a detailed inquiry and provided it to the necessary tribes. This is all that the law requires. (§ 224.2, subd. (e).)

We review the juvenile court's ICWA findings for substantial evidence. (*In re Hunter W.* (2011) 200 Cal.App.4th 1454, 1467; accord *In re D.S.* (2020) 46 Cal.App.5th 1041, 1051.) Here, there is substantial evidence in the record that the Department complied with its duties of inquiry and notice as required by the ICWA. At the inception of the dependency proceedings, as we have explained, there was no indication the minor was an "Indian child" pursuant to section 224.2, subdivision (d). At best, the court and the Department had information suggesting mother *may* have Indian ancestry with the Hoopa, Cherokee, Pit River, and Yurok Tribes. That is, the court had a "reason to believe" the minor may be an Indian child, thus triggering the duty to make further

19

inquiry "as soon as practicable." (§ 224.2, subd. (e).)[2] Further inquiry required the Department to interview the parents and extended family members to gather information; contact the BIA for assistance in identifying tribes to notice; and contact the tribes regarding the minor's possible membership or eligibility status and to share information "identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2).)

Between March 2019 and June 2019, the Department conducted further inquiry by interviewing the parents and performing relative locator searches to find relatives of mother who might have additional Indian ancestry information. But the Department was unable to find or contact any maternal relatives, and, as we have explained, the parents were of no help. The Department also sent several versions of the ICWA notices to the BIA and numerous tribes, including the tribes identified by the parents.

ICWA notice must include all of the following information, if known: the child's name, birthplace, and birth date; the name of the tribe in which the child is enrolled or may be eligible for membership; names and addresses (including former addresses) of the child's parents, grandparents, and great-grandparents, and other identifying information; and a copy of the dependency petition. (§ 224.3, subd. (a)(5)(A)-(H); *In re D.W., supra,* 193 Cal.App.4th at p. 417; *In re Mary G.* (2007) 151 Cal.App.4th 184, 209.) Here, the ICWA notices contained all the required information, plus all of the information that the Department had been given regarding Bruce L. Further, each time the Department obtained new information from the parents or through its own investigation, the ICWA

---

[2] Effective September 18, 2020, Assembly Bill No. 2944 amended section 224.2, subdivision (e) and its definition of "reason to believe" the minor is an Indian child for purposes of the ICWA. (Stats. 2020, ch. 104, § 15.) We previously granted father's request for judicial notice of Assembly Bill No. 2944.

notices were amended to include that information. The efforts undertaken by the Department, and particularly the ICWA monitor, were detailed in reports and declarations and provided to the parties and the court.

Based on the information provided from the respective tribes and the Department's detailed account of its inquiry and notice efforts, *and with both parents having submitted on the matter without objection*, the juvenile court granted the Department's motion to rule out application of the ICWA, finding the responses from the respective tribes and the BIA "do not establish that the minor is an Indian child or are not determinative of whether the minor is an Indian child" within the meaning of the ICWA.

As in every juvenile dependency proceeding, the Department and the juvenile court had an "affirmative and continuing duty" to determine whether the ICWA applied. (§ 224.2, subd. (a); *In re D.S., supra,* 46 Cal.App.5th at p. 1048.) Here, the Department performed its continuing duty after the March 10, 2020 hearing by making additional efforts to contact the Yurok Tribe. On June 9, 2020, the Yurok Tribe informed the Department that the minor was neither enrolled nor eligible for enrollment and the Tribe would not be intervening in the case. The fact that the Yurok Tribe asserted there was a reason to believe the minor was an Indian child, without more information to enable the Department to make further inquiry, did not provide a basis for the juvenile court to reverse its prior determination that the ICWA did not apply. Further, that order is not before us on this appeal.

Substantial evidence supports the juvenile court's October 2019 conclusion, implicitly adopted at the March 2020 hearing from which this appeal was taken, that the ICWA does not apply.

## DISPOSITION

The juvenile court's orders are affirmed.

/s/
Duarte, J.

We concur:

/s/
Mauro, Acting P. J.

/s/
Krause, J.